Pamela Lynn PERILLO, Appellant,

v.

The STATE of Texas, Appellee.

No. 69435.

Court of Criminal Appeals of Texas, En Banc.

Sept. 14, 1988.

William W. Burge, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Timothy G. Taft, J. Sidney Crowley and Glenn Gotschall, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appellant's first conviction for the offense of capital murder as proscribed under V.T.C.A. Penal Code, § 19.03(a)(2), was reversed by this Court for error committed during voir dire. *Perillo v. State,* 656 S.W. 2d 78 (Tex.Cr.App.1983). Appellant has now been tried and convicted a second time. Once again the jury answered special issues affirmatively and the trial court assessed her punishment at death. Article 37.071, V.A.C.C.P. The cause is before us again on automatic appeal. Appellant raises five points of error. We will affirm.

Although appellant does not attack sufficiency of the evidence, a recitation of the facts will aid our disposition of her first three points of error. The evidence presented at appellant's trial parallels that adduced at the separate trial of her codefendant, Mike Briddle, which we summarized in *Briddle v. State,* 742 S.W.2d 379, 381–82 (Tex.Cr.App.1987).

On the night of March 3, 1980, Sergeant Harold McMillian of the Denver Police Department was "hailed" by appellant on a downtown street in Denver, Colorado. As she approached McMillian's patrol car, appellant told him that "[she] and Mike killed two Bobs in Texas." Appellant was transported to police headquarters where she elaborated upon this statement in a full confession. The story she told, as supplemented by the physical and forensic evidence and testimony of other witnesses at her trial (excluding the testimony of Linda Fletcher, whose testimony we will treat individually in relation to point of error one), follows.

In order to avoid apprehension for an aggravated robbery, Briddle fled California with his wife, Linda Fletcher, and hitchhiked to Texas. Appellant, who had also participated in the robbery, joined the two en route in Tucson, Arizona. Eventually this troika landed in Houston, where on the evening of Friday, February 21, 1980, the first "Bob," Robert Banks, picked them up in his van as they were hitchhiking near the Astrodome. Banks was in the process of moving his belongings from an apartment to a house, and made the fatal mistake of offering to compensate the three for helping him with the move. For two nights they stayed with Banks. On Saturday evening Banks and his three guests went to a rodeo at the Astrodome. Returning to Banks' new abode, they found the second "Bob," Bob Skeens, a friend of Banks' from Louisiana, waiting for them. Skeens had arrived in his green Volkswagen.

Sunday morning, February 23, Banks and Skeens arose early and left the house to fetch coffee and donuts. While they were out, Briddle and appellant secured an M–1 rifle and a .45 caliber revolver, respectively, that belonged to Banks. When "the two Bobs" returned, Briddle and appellant "pulled the guns on them and told them to lay down." Skeens immediately complied, but Banks, suspecting a joke, did not. Briddle struck Banks on the side of the head with the rifle, knocking him down and causing him to bleed "pretty bad." Appellant and Briddle then bound their victims, hands and ankles, with nylon rope.

Skeens' ankles were later untied, and he was forced to walk to a back bedroom, where he was rebound. Back in the living-room, a piece of rope was wrapped twice around Banks' neck, and, in appellant's words, "one of us pulled on one end and the other pulled on the other end" for about ten minutes. They knew this had killed Banks because "we felt his heart beat and he wasn't breathing. He was spitting up blood and blood was coming out of his nose."

After Banks was thus dispatched, Briddle, appellant and Fletcher all began to load Skeens' Volkswagen with various items taken from the house, including the M-1 rifle and the .45 revolver, plus a shotgun also belonging to Banks. Also taken were a camera and a radio/cassette player. Within an hour of Banks' death, ignoring Skeens' pleas to let him live, Briddle and appellant killed him in the same grisly manner.[1] According to appellant's confession, although Fletcher viewed the bodies afterwards, she was not present when the killings occurred.

The three fled to Dallas in the Volks-wagen, where they abandoned the car in a downtown parking garage and purchased bus tickets to Denver. Banks' shotgun was left in the Volkswagen. Once in Denver, appellant and Briddle pawned the radio/cassette player and sold the M-1 rifle to a patron in a bar. The .45 revolver was also sold but apparently never recovered. The camera could not be pawned and was later found in a search of appellant's hotel room. Eventually appellant contacted the Denver police because, as she put it, "I want to stop running and get my son back." The bodies of Banks and Skeens were discovered by Houston police when Banks failed to show up for work after three days. The pants pockets of each had been turned out and their wallets were missing.

In her first point of error appellant maintains she was denied effective assistance of counsel. Her argument appears to be two-fold. First she contends that the trial court erred in failing to inquire into the existence of a conflict of interest on the part of lead defense counsel when the court knew or should have known that a particular conflict existed. See *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Cuyler v. Sullivan*, 446 U.S. 335, at 347, 100 S.Ct. 1708, at 1717, 64 L.Ed.2d 333, at 346 (1980). As appellant points out in her brief, there is some suggestion in *Wood v. Georgia*, 450 U.S. 261, at 272, n. 18, 101 S.Ct. 1097, at 1104, n. 18, 67 L.Ed.2d 220, 230–31, n. 18 (1981), that when the mere possibility or potential for a conflict of interest is or should be apparent to the trial court, an affirmative duty to inquire arises. See also *Ex parte McCormick*, 645 S.W.2d 801, at 805, n. 15 (Tex.Cr.App.1983). At any rate, she continues, though she made no objection at trial, she is entitled to a reversal because an actual conflict was shown to exist which adversely affected her counsel's performance. *Cuyler v. Sullivan*, 446 U.S. at 348, 100 S.Ct. at 1718, 64 L.Ed. 2d at 346–47; *Gonzales v. State*, 605 S.W.2d 278, 282 (Tex.Cr.App.1980).

Specifically, appellant contends that her attorney, James Skelton, was hampered in his ability to crossexamine Linda Fletcher, an accomplice witness at appellant's trial, because he had earlier represented Fletcher in her own aggravated robbery trial stemming from the same transaction.[2]

Prior to Fletcher's direct testimony a brief hearing was held out of the presence of the jury. There it was shown that Fletcher had initially been charged with capital murder but was later recharged with and convicted of aggravated robbery; that she had been assessed five years' pro-

---

1. In a two count indictment appellant was charged with capital murder of both Banks and Skeens, but only the second count, authorizing conviction for the killing of Skeens, was submitted to the jury. Briddle was convicted of the capital murder of Banks. *Briddle v. State,* supra.

2. The trial court instructed the jury that Fletcher was an accomplice as a matter of law, whose testimony would therefore have to be corroborated and believed in order to support a conviction. Appellant does not now challenge sufficiency of the evidence to corroborate her testimony.

bation, which had already been successfully completed; that Skelton had indeed represented her at that trial, but no attorney/client relationship between them currently existed; and that she had other counsel present advising her at appellant's trial. That other counsel, Will Gray, informed the trial court:

> "... I have instructed her that she should assert her attorney/client privilege as to any privileged communications between her and Mr. Skelton based on his prior representation and she intends to do that, I believe."

The trial court responded, "I guess we will meet that matter when it arises." Thus it appears true that the trial court failed to make a detailed inquiry at the first moment it should have appeared that a *potential* for conflict of interest existed. Nevertheless we perceive no basis to reverse the judgment, for as matters developed it became clear there was no actual conflict.

Taking Fletcher on crossexamination, Skelton first elicited that not only had he been appointed to represent her at her own trial for aggravated robbery, but he had since become her personal friend and had even flown out to California to attend her wedding when she remarried after her marriage to Briddle was annulled. She also acknowledged that during her trial they had decided she should not testify, and that Skelton had therefore found no need to discuss "the facts of the case with [her] because [he] had read the file and knew what had transpired and didn't need to know [her] testimony." Skelton was instrumental in obtaining Fletcher's presence for the State at Briddle's trial, but did not hear the testimony she gave there. In fact, Skelton never discussed with Fletcher the details of the morning of the killings until the night before she took the stand at appellant's trial:

> "Q As a matter of fact, you and I sat down [last night] and went through part of what you had testified to. Correct?
>
> A Yes.

> Q And I outlined for you the sort of things I was going to go into on cross examination. Correct?
>
> A Yes.

> Q Now, the reason I am going through that elaborate explanation, there is nothing in the things I am fixing to go through with you that I have discussed with you last night that ever came about in our attorney/client relationship with you. Correct?
>
> A Yes."

Appellant likens her situation to that in *United States v. Martinez*, 630 F.2d 361 (CA5 1980). The government called a witness at Martinez' trial who had not been on its witness list and whom his trial counsel had represented in a prosecution arising from the same transaction. Counsel informed the court that to thoroughly crossexamine the witness would require a breach of attorney/client confidence and that his discomfort with this "might impair his effectiveness in representing Martinez." *Id.*, at 362. The court required counsel to proceed, and he conducted an apparently "vigorous" crossexamination, even seeming to violate that confidence to some extent. However, observing that "we cannot be sure that, because he failed to pull some punches, he refrained from pulling others[,]" the Fifth Circuit found an actual conflict to exist.

■ We discern no impairment, expressed or apparent, in this case such as was present in *United States v. Martinez*, supra. Here Skelton affirmatively demonstrated that no breach of confidential communication between attorney and client could have "trenched upon" his ability to crossexamine Fletcher for the simple reason that no such communication pertaining to the actual events transpiring on the morning of February 23, 1980 took place between them during the period of his representation of her.[3] Thus, we perceive no conflict.

---

**3.** Appellant cites *United States v. Kitchin,* 592 F.2d 900, 905 (CA5 1979), for the proposition that there is a presumption that an attorney receives confidential communications in the course of his representation of a client. Even if such a presumption can be gleaned from *Kitchin,* supra, and would be applicable here, surely it has been rebutted.

Nevertheless, appellant maintains Skelton was ineffective inasmuch as his "prior representation of [Fletcher] and subsequent social and personal involvement with [her] prevented him from having an objective view of this evidence." She contends "it is virtually impossible to assess the impact of counsel's prior relationship on his options and tactics." We disagree. Under the circumstances presented, we cannot conceive of any more reasonable tactic than that which counsel pursued.

The State used the testimony of Fletcher in its case in chief essentially to flesh out the somewhat skeletal account of the events outlined above. She testified that on the Friday night when Banks picked up Briddle, herself and appellant, they helped unload some of Banks' belongings at the house, returned to the apartment to reload the van, and later went to a restaurant to eat. Banks paid for the meal with a one hundred dollar bill, and as she stood behind him at the cashier's counter, appellant remarked to Briddle that Banks had "a lot of money in the wallet." Afterwards the group went to a bar, where Banks continued to treat. At this point Banks began to make overtures toward appellant, which were apparently rebuffed. After spending the night at the house, the four went out for breakfast and proceeded to Banks' apartment to shower and pick up another load. While Banks was in the shower, Briddle and appellant discovered the weapons in his bedroom. Briddle then telephoned a friend in California and "told him he had a pidgeon [sic] in Houston with a lot of money and some guns[,]" but could not persuade his friend to come to Houston. Briddle loaded the guns into the van.

That night they all attended the rodeo, Banks paying appellant's admission. At one point while Banks had gone to get beer, appellant "said that she would like to kill him . . . [b]ecause he had been touching her." Later Briddle left his seat, and when

Fletcher and appellant went to find him he told them "he was planning." Appellant inquired whether they were "going to do it tonight." When Banks later refused to leave the rodeo early at appellant's request, she turned to Briddle and "said we are going to do it tonight." After the rodeo they went to a bar, where Banks bought drinks and continued to "pay attention" to appellant.

Back at the house, Skeens had arrived. Briddle and appellant discussed getting a gun from the van, but Briddle vetoed the idea. A short time later appellant, quite drunk, approached Fletcher in the bathroom with a pistol in her hand. Appellant suggested that Fletcher retrieve a gun from the van "and come in and surprise them." Fletcher declined. When she went to bed that night, Fletcher discovered the pistol appellant had wielded hidden beneath her mattress.

Next morning appellant woke Fletcher with the news "that they were gone." Appellant had the gun in her hand again. Briddle got up and dressed, retrieved the shotgun,[4] and hid himself in a closet. When "the two Bobs" returned with coffee and donuts, Briddle began tapping on the closet door. As Banks started to investigate, Briddle burst out of the closet and announced "that this was a robbery." He then struck Banks, who had approached him "[w]ith his palms up and his hands open." Appellant emerged from the back of the house displaying the pistol and declaring "that this wasn't a joke." Briddle tied Banks as appellant held Skeens at gunpoint. After tying Skeens, the two rifled the pockets of their victims, and Briddle was excited to find $800.00 in Banks' wallet. During all this Briddle and appellant consumed the coffee and donuts. When Fletcher became visibly upset at the turn of events, appellant remarked to Briddle that she "didn't have any heart." Fletcher was instructed to load the Volkswagen. At

---

Additionally we note the Fifth Circuit has indicated that even an actual conflict such as that found in *Martinez,* supra, will not call for reversal absent some showing of an "adverse effect." *United States v. Olivares,* 786 F.2d 659 (CA5 1986).

4. There were, obviously, some minor discrepancies between appellant's confession and Fletcher's account.

one point in this process she observed Briddle straddling Banks and "wrapping a rope around his neck." Appellant sat on the floor next to Banks' head, smoking a cigarette.

On the way to Dallas appellant demanded "her half of the money." As they drove past the Women's Unit in Huntsville, Briddle remarked "that was where [appellant] was going to spend the rest of her life." Appellant responded with a nervous laugh. Later appellant instructed Fletcher to "keep [her] mouth shut if [they] were ever discovered." Upon abandoning the Volkswagen in Dallas, appellant suggested they leave one window open so that dust would collect inside to obscure any fingerprints.

In Dallas the trio dined on steak while waiting for the bus to Denver. Appellant, in an apparently "calm" state of mind, commented "that this was blood money we're eating." On the bus to Denver Fletcher awoke to overhear appellant replaying a tape recording she had apparently just made on Banks' cassette recorder in which she "was making gagging noises." Fletcher then listened as appellant dictated statements "similar to the rope is too tight" or "I don't like looking at your face, your face is turning blue." Briddle was amused, but eventually made appellant stop.

Fletcher also testified to facts from which it could be inferred that appellant had approached the Denver police out of anger stemming from an argument with Briddle.

Obviously Fletcher's direct testimony was most damaging to appellant, not only as it pertained to the question of guilt, but also as it related to the special punishment issues, particularly future dangerousness. Article 37.071(b)(2), supra. Other than testimony from two California police officers that appellant's reputation there for peaceableness was bad, in this cause the State would present no new evidence at the penalty stage bearing on this issue. Fletcher's testimony was undeniably susceptible to interpretation as demonstrating in appellant's attitude both before and after commission of the offense a most "calculated and cold-blooded" bent. See *O'Bryan v. State*, 591 S.W.2d 464, 480 (Tex.Cr.App. 1979).[5] It was imperative that counsel neutralize the effect of that testimony, if he could.

█ Rather than attempt to undermine her direct testimony by impeachment or rigorous interrogation, Skelton set out to establish an immediate rapport with Fletcher before the jury, and to utilize her as a friendly witness. He appears to have tried thereby to accomplish two objectives: first, to recast Fletcher's direct testimony in a less damning light as it pertained to appellant; and second, to portray Briddle as another Charles Manson, whose pernicious influence led both Fletcher and appellant astray.

Accordingly, he adduced the following testimony from Fletcher on crossexamination. During her sophomore year of college Fletcher, who was a good student, first heard from Briddle when he answered a letter she had written to another San Quentin inmate, apparently as part of an unspecified school project. They began to correspond. She learned he was a member of the Aryan Brotherhood, a white supremacist group, and that he had met and idolized Charles Manson and believed he could duplicate Manson's mind control abilities. Fletcher became infatuated with Briddle, and soon married him. When Briddle was paroled they moved to Los Angeles, and Fletcher became estranged from her family. Under Briddle's tutelage Fletcher soon "graduated" from a recreational use of drugs to serious abuse of cocaine, methamphetamines and heroin. At Briddle's instigation, she turned to prostitution and shoplifting to support their habits. Briddle frequently beat her.

When they fled California they had only about $30.00 between them. On the road Briddle forced Fletcher to prostitute herself at truck stops. Afraid that appellant would identify him back in California, Brid-

5. And, indeed, in final argument at the punishment stage the prosecutor would use the details of Fletcher's testimony quite effectively to suggest just such a bent on the part of appellant in pressing for an affirmative answer to special issue two.

dle persuaded a truck driver to pay to have her flown to Tuscon. From there the three went on to Texas. Although appellant refused to prostitute herself for Briddle, she did participate in shoplifting. The drug use continued.

Skelton was able to ameliorate the impact of some of appellant's statements surrounding the offense by having Fletcher give the jury her sense impressions of what appellant meant. For instance, it was shown that at the time Banks paid for their meal on Friday night, Briddle and even Fletcher herself also remarked that he seemed to have a lot of money in his wallet, although nobody talked of robbing him at that point. Appellant's remark at the rodeo about wanting to kill Banks seemed to Fletcher no more than an expression of "frustration" caused by his overzealous solicitations. Briddle and appellant seemed to be "planning" only a robbery; Fletcher did not anticipate any killings. When appellant approached her in the bathroom with the pistol on Saturday night, Fletcher thought she was "just being silly" and not really in earnest. On Sunday morning there was no talk of killing even as the robbery progressed.

As they fled to Dallas both Fletcher and appellant began to fear Briddle, who insisted the three should not separate. Appellant protested that she wanted to go to her family in Iowa, and she and Briddle argued. Otherwise Briddle was "jovial" while appellant was "quiet." Once, when they had stopped on the roadside for Fletcher to use the bathroom, Briddle approached her with the pistol tucked into his belt. Appellant cried out that a truck was coming and Fletcher ran past Briddle back to the car. Appellant confided later she thought Briddle had intended to kill Fletcher. Fletcher perceived appellant's remark in Dallas about "blood money" to be a serious attempt to communicate that "something really bad has happened."[6]

We agree with appellant that at final argument at the guilt stage counsel was unable to argue very convincingly that appellant played no role in the murders of Banks and Skeens. On the state of the evidence, however, this would likely have been the case even had Skelton attempted to impugn Fletcher's credibility, as appellant now asserts he should have done. What Skelton did accomplish during his final argument at the guilt stage was to begin to develop the theme that appellant, like Fletcher, had fallen under Briddle's influence. Thus he began to lay a foundation to argue at the punishment stage that, removed from that influence, appellant would not pose a future danger to society. To that end a number of witnesses were presented at the punishment stage to attest to appellant's abuse as a child, her contriteness and good behavior in jail, and her sincere conversion to Christianity. A psychologist testified, *sans* rebuttal by the State, that appellant was a "follower," who:

> "... if ... she needed to to be active and there were a lot of negative influences in her life that would be the bend that the activity would take. If there were a lot of positive influences in her life that would be the activity she would seek and go after."

Fortified with this additional evidence, Skelton urged in final argument at the punishment stage that, with the help of several of the witnesses who had expressed a willingness to provide a positive environment for her, appellant would pose no future threat.

We believe this was a viable defensive posture, and that it was facilitated by Skelton's strategy to conduct his crossexamination of Fletcher in the manner that he did. We find no conflict of interest; nor can we conclude that counsel's performance was *adversely* affected by his prior representation of Fletcher. *Cuyler v. Sullivan,* supra; *Gonzales v. State,* supra; *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674, 696 (1984); *Nealy v. Cabana,* 782 F.2d 1362 (CA5

---

**6.** Skelton also tried to show, without success, that the cassette recording made on the bus was an attempt by appellant "to leave ... some sort of record in the event something happened to her." Fletcher did not have that impression.

1986). Appellant's first point of error is overruled.

■ In her second point of error appellant contends that the trial court erred in overruling her objection to the jury charge that it failed to authorize the jury to convict of the lesser included offense of aggravated robbery. Appellant submits that had the jury chosen to disbelieve or disregard her confession, all that would remain to prove she participated in the killings would be the testimony of Fletcher, who was not an eyewitness to the killings themselves. Thus, she argues, under *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), a charge on the lesser offense was required.

In our view, however, the evidence did not raise the lesser included offense of aggravated robbery. According to Fletcher's testimony appellant brandished a pistol during the offense, helped to disable the victims, and sat at Banks' head as Briddle looped the fatal rope around his neck. This evidence alone would certainly support a jury's inference that appellant acted either as a principal actor in or as a party to the strangulation of Banks, and later, of Skeens. Except in the minutia, Fletcher's testimony was wholly consistent with appellant's own confession, in which she admitted direct participation in the killings.

The record provides no affirmative basis for a rational jury to reject that account.[7] In short, there is no evidence to indicate that appellant, if guilty at all, is guilty only of the lesser included offense of aggravated robbery.[8] *Bell v. State*, 693 S.W.2d 434 (Tex.Cr.App.1985). Inasmuch as the issue was not raised by the evidence, we discern no constitutional deficiency such as that found in *Beck v. Alabama*, supra.[9] This ground of error is overruled.

■ Appellant next complains that the trial court erred in admitting her confession into evidence. The confession was taken verbatim, stenographically, in question and answer form, and later reduced to writing and signed by appellant. The gist of her argument is that the Denver police failed to warn her prior to taking her confession that she had "the right to terminate the interview at any time[.]" Article 38.22, § 2(a)(5), V.A.C.C.P. The flaw in appellant's argument is that she assumes her confession was admitted as a written statement. The State tendered it to the trial court, however, on the theory it was an oral statement "which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused[.]" *Id.*, § 3(c). In its findings of facts and conclusions of law following the *Jackson v. Denno* hearing

---

7. Appellant offered a second confession which she made to a Houston police officer a day after she gave Denver police her first confession. In final argument at the guilt stage, counsel argued that the police sought a second confession because they did not find her first confession credible. However, in the second confession appellant assumed full responsibility for the murders, contending that Briddle was not even present at the time. This hardly supports a theory that appellant's participation was limited to aggravated robbery.

We also note the trial court included a paragraph in the charge that should the jury find appellant was not properly warned prior to confessing to the Denver police, it should disregard that confession. However, Sergeant McMillian and another Denver officer, Detective Diaz, who took the confession, each established without contradiction at a *Jackson v. Denno* hearing that appellant was fully apprised of her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before giving them her confession. Appellant could only testify at the hearing that she had been under the influence

of drugs at the time and did not remember whether her rights were given to her. The testimony of McMillian and Diaz was duplicated before the jury, again without controversion. Under the circumstances it would have been irrational for the jury to reject appellant's confession by authority of the court's overly cautious instruction.

8. The writer nevertheless adheres to observations made in his dissenting opinions in *Watson v. State*, 605 S.W.2d 877 (Tex.Cr.App.1980) and *Aguilar v. State*, 682 S.W.2d 556 (Tex.Cr.App. 1985).

9. Without now deciding whether the federal standard is any different in application than our so-called "guilty only" test, we also conclude that here "the evidence would [not] permit a jury rationally to find [appellant] guilty of the lesser offense and acquit [her] of the greater." *Cordova v. Lynaugh*, 838 F.2d 764, at 767, and n. 3 (CA5 1988), *cert. den.*, —— U.S. ——, 108 S.Ct. 2832, 100 L.Ed.2d 932 (1988).

the trial court found this to be so, "specifically, that the [appellant's] statements led to the recovery of property stolen in the offense, namely, a Volkswagen automobile owned by the [deceased], Bob Skeens, and a shotgun owned by Robert Banks." The record bears out this finding. Although we have held that *Miranda* warnings must precede a confession offered under Article 38.22, § 3(c), supra, see e.g., *Butler v. State*, 493 S.W.2d 190, at 193, n. 1 (Tex.Cr. App.1973), the right to terminate the interview at any time is not expressly among those warnings required by *Miranda*. Nor does appellant assert that *Miranda* has been transgressed. Because § 3(c) expressly exempts confessions otherwise admissible under its terms from the *statutorily* required warnings, we cannot conclude that Article 38.22, supra, has been violated. Appellant's third point of error is overruled.

▉ In her fourth point of error appellant contends the trial court erred in sustaining the State's challenge for cause against venireman Griggs. Mrs. Griggs indicated she believed capital punishment was unacceptable because "a person, man or woman, should be given a chance to repent[.]" After explaining the function of special issues at the punishment stage of trial, Article 37.071(b)(1) and (2), supra, the prosecutor elicited from her the statement that she "could not in good conscience answer the [special issue] questions so that they could be in such a manner that the Judge would have to sentence them to death." The State then challenged Griggs for cause.

On cross voir dire Griggs characterized answering special issues in the affirmative where the evidence warrants even though it would result in imposition of the death penalty as her "dilemma." Nevertheless, appealing to her "civic duty," defense counsel was able to elicit an admission from Griggs that she could answer each question individually in the affirmative if proven so beyond a reasonable doubt, though Griggs made it clear she did not "want to be a party to sentencing someone to death." And in fact, almost immediately thereafter, when defense counsel reiterated his question in short form whether she could answer the two questions yes, responded, "I don't think so, no." Moments later she testified:

"BY [DEFENSE COUNSEL]:

Q Would you always vote no, Mrs. Griggs, to one of those questions?

A You know, I just don't know what I would do under the circumstances. I think I know what I would do under the circumstances."

At this point the trial court interceded, pressing Griggs for a more definite answer. The following colloquy ensued:

"THE COURT: And in the proper case, if the State proved to you that the deceased who—excuse me—the defendant who committed this offense for which you found him guilty of intentionally committing a felony offense of taking the life of another and you found that his acts were deliberate and with the reasonable expectation that a life would be taken, a life of the deceased of another person, the State proved that beyond a reasonable doubt, you could answer that question yes?

MRS. GRIGGS: Yes.

THE COURT: And if you had a reasonable doubt you could answer it know. Is that correct?

MRS. GRIGGS: Yes.

THE COURT: And then if the State proved to you that there is a probability that the defendant might commit future acts of violence that would be a continuing threat to society and if they proved to you that beyond a reasonable doubt, could you answer that question yes?

MRS. GRIGGS: If that is the law of the land, that is what I would do, you know, to say yes.

THE COURT: And knowing that your answer yes would put me in a position to sentence someone to death?

MRS. GRIGGS: I know the point, I know what you are saying.

THE COURT: Well, that is the point that we have to clear up.

MRS. GRIGGS: I can say yes to both issues.

THE COURT: Knowing I would sentence the defendant to death?

MRS. GRIGGS: Yes.

THE COURT: You can do that?

MRS. GRIGGS: I can.

\* \* \* \* \* \*

THE COURT: Okay. Now, realizing that you have answered the question both ways—

MRS. GRIGGS: Both ways.

\* \* \* \* \* \*

THE COURT: You are just saying you don't want to, you don't want the obligation?

MRS. GRIGGS: I don't want the obligation.

THE COURT: But if you were called upon to serve you are stating you could do it?

MRS. GRIGGS: Yes."

But almost immediately Griggs pivoted and told the prosecutor she could *not* answer the questions affirmatively knowing death would be imposed because she felt she could "[u]nder no circumstances put [herself] in a position of having to sentence someone to death." At this point an obviously frustrated trial court recessed for lunch, instructing Griggs to give some thought to her answers with a view toward resolving the conflict.

After the lunch recess venireman Griggs reaffirmed that her opposition to the death penalty would cause her to answer at least one of the special issues negatively. She acknowledged she would "automatically" answer one of the two questions no, "on every occasion." Finally:

"THE COURT: Now, are you sure of these answers?

MRS. GRIGGS: Yes. I thought about it as long as I had, an hour and a half.

THE COURT: And even though I would instruct you and give you the law and tell you that the State had this burden and this is the charge and this is what

they have to prove and the whole thing and you would not follow my instructions and if you even though believed these things beyond a reasonable doubt, Question 1 and 2 was proved up, you would still persist in answering them no because you would know that I would inflict—or sentence a person to death?

MRS. GRIGGS: Yes. I feel that my belief, I have to be true to my belief that I do not believe in capital punishment more than I believe in the law of the State.

THE COURT: Now, okay, that makes sense. Are you saying that your feelings are so strong against capital punishment that they outweigh and overpower anything that me as a Judge can tell you as far as instructing you as to the law?

MRS. GRIGGS: Yes.

THE COURT: And I can't make you change your mind on that?

MRS. GRIGGS: No."

Defense counsel was provided another opportunity to question Griggs. This time she continued to insist she could not answer the special issues affirmatively. The trial court then granted the State's challenge for cause. Defense counsel objected to the excusal of Griggs "because of the different answers she gave on different occasions." The trial court invited him to voir dire her further if he thought he could rehabilitate her, but counsel declined.

Appellant now argues that Griggs "simply was not wanting the responsibility of making such decisions, but she also made it clear that if compelled to be a juror she would follow the law and make decisions, i.e., she would be willing to temporarily set aside her beliefs in deference to the rule of law." It is true that on several occasions during her voir dire Griggs evinced such a willingness. Other times, however, she expressed the opposite view. In short, venireman Griggs is a classic example of a "vacillating" venireman.[10]

---

**10.** Judge Teague distinguishes "vacillating" jurors from "equivocating" jurors, thusly:

"A 'vacillating juror' is a venire member who first takes one position, then switches to the other, as to whether or not he or she can answer the special issue questions 'yes,' see Art. 37.071, V.A.C.C.P., even though he or she knows that such answers will result in the death penalty being imposed. An 'equivocating' juror is a venire member who fails to take

The State is entitled to jurors in a capital case who "will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589 (1980). Clearly the court and counsel for both parties understood this, and the questions adduced were incisive and to the point in attempting to ascertain Griggs' ability to follow our particular capital punishment scheme. See *Hernandez v. State*, 757 S.W.2d 744, (Tex. Cr.App., No. 69,649, delivered June 29, 1988) (Plurality Opinion). We agree with appellant that at times venireman Griggs' responses seemed to indicate she was precisely that type of juror *Adams* held could not be excluded from service in a capital case. Intermittently she testified she could resolve her "dilemma" by simply acknowledging her "civic duty" to answer special issues truthfully in accordance with the evidence, irrespective of the possible consequence. Other times, and ultimately, she just as firmly maintained her scruples against the death penalty would overcome her sense of civic duty and cause her consciously to distort her answers in order to avert that result. It is on the state of a record such as this that we most appropriately afford "great deference ... to the trial court's discretion" in deciding whether to excuse a venireman on the basis of an inability to follow the law as prescribed by Article 37.071, supra. See *Ex parte Williams*, 748 S.W.2d 461, at 464 (Tex.Cr. App.1988), quoting *Ex parte Hughes*, 728 S.W.2d 372, at 375 (Tex.Cr.App.1987). For the instant voir dire presents an adequate basis to support the trial court's ruling *either* that the venireman was challengeable, as in fact the court ruled here, *or that she was not*. Finding support in the record for the trial court's judgment that Griggs was substantially impaired in her ability to perform her duties as a juror in accordance

with her instructions and her oath, *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851–52 (1985), we hold that in granting the State's challenge for cause against this "vacillating" venireman, the trial court committed no error. Appellant's fourth point of error is overruled.

■ Finally appellant complains that the trial court erred in failing adequately to instruct the jury to consider any mitigating evidence bearing on its deliberations at the punishment stage. Appellant neither objected to the absence of such a charge, nor requested that a particular charge be given. This Court has steadfastly overruled this contention even in the face of a timely requested instruction. *Gardner v. State*, 730 S.W.2d 675, 702 (Tex.Cr.App.1987). Appellant's fifth point of error, therefore, is also overruled.

The judgment of the trial court is affirmed.

TEAGUE, J., dissents to disposition of point of error two.

---

a firm position on the issue, answering, for example, 'I think,' or 'I'm not sure.'" *Williams v. State*, 622 S.W.2d 116, 121 (Tex.Cr. App.1981) (Teague, J., dissenting). Without recognizing this distinction, this Court has in the past observed, in upholding challenges for cause against "equivocating" veniremen, that "it must be remembered that the trial judge heard the tone of her voice and observed her demeanor and was in the better position to pass on the challenge for cause presented." *Smith v. State*, 676 S.W.2d 379, at 387 (Tex.Cr.App.1984). See also, e.g., *Smith v. State*, 683 S.W.2d 393, at 401, n. 5 (Tex.Cr.App.1984); *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr.App.1981).