Richard Gerry DRINKARD, Appellant,

v.

The STATE of Texas, Appellee.

No. 69660.

Court of Criminal Appeals of Texas, En Banc.

June 14, 1989.

Rehearing Denied Sept. 13, 1989.

Doug O'Brien, court appointed on appeal only, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and William J. Delmore, III & Glenn Gotschall, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

OPINION

McCORMICK, Presiding Judge.

Richard Gerry Drinkard was convicted by a jury of the offense of capital murder. At the punishment stage of the trial, the jury returned affirmative findings to both special issues and appellant was sentenced

to death. In his appeal to the Court of Criminal Appeals, appellant asserts three points of error. All three points concern the voir dire phase of the trial.[1] Finding no error, we affirm appellant's conviction.

In his first point of error, appellant complains the trial court erred in excusing veniremember Michael Shelby on the State's challenge for cause. Appellant argues that Shelby's views on the imposition of capital punishment did not disqualify him from service as a juror, according to the United States Supreme Court's rulings in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

In the case of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court set forth the long-standing measure for determining whether a veniremember was excludable due to opposition to the death penalty. Under the *Witherspoon* rule a veniremember could be excluded only where they made it unmistakably clear they would automatically vote against the imposition of the death penalty, or where their attitude would preclude them from making an impartial determination of guilt or innocence.

In *Wainwright v. Witt*, supra, the United States Supreme Court took the opportunity to clarify the holding in *Witherspoon v. Illinois*, supra. In *Wainwright*, supra, the Court abandoned both *Witherspoon's* substantive standard and its stringent burden of proof requirement. See also, *Ex parte Russell*, 720 S.W.2d 477 (Tex.Cr.App. 1986). The *Wainwright* opinion reaffirmed the *Adams v. Texas*, supra, standard for determining when a veniremember may be excluded for cause due to his or her views on capital punishment, stating that the appropriate measure is "whether a juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright*, 469 U.S. at 424, 105 S.Ct. at 852 (citing *Adams*, 448

U.S. at 45, 100 S.Ct. at 2526). This standard has been adopted and applied by the Court of Criminal Appeals. See e.g., *Knox v. State*, 744 S.W.2d 53 (Tex.Cr.App.1987); *Montoya v. State*, 744 S.W.2d 15 (Tex.Cr. App.1987); *Mann v. State*, 718 S.W.2d 741 (Tex.Cr.App.1986); *Clark v. State*, 717 S.W.2d 910 (Tex.Cr.App.1986); *Carter v. State*, 717 S.W.2d 60 (Tex.Cr.App.1986); *Hogue v. State*, 711 S.W.2d 9 (Tex.Cr.App. 1986); *Sharp v. State*, 707 S.W.2d 611 (Tex.Cr.App.1986).

The following excerpts from the record containing the voir dire examination of veniremember Shelby are relevant to the inquiry:

"Q: And I need to know if the State proves to you beyond a reasonable doubt that these two special issues should be answered yes, will you answer them yes every time?

"A: No.

"Q: Is that a strong feeling that you have?

"A: Yes.

"Q: And is it based at least in part upon the opposition to the death penalty that you expressed earlier?

"A: Yes.

"Q: Now, there are some situations where you might say that I can give you an example of somebody who killed a hundred people and who has been in the penitentiary a thousand times and give you some fact situation like that, if the State proved to you beyond a reasonable doubt that the question should be answered yes, can we rely upon you to answer them yes?

"A: In some situations the death penalty is appropriate. I don't question that. That is not why I would say that I couldn't always answer it. In some situations I just feel like that the death penalty, as far as I was concerned, wouldn't be appropriate even if both of these, even if I could answer yes to both of these, I feel that these criteria are just—I mean there is something

---

1. As appellant does not take issue with the sufficiency of the evidence to support the conviction,

we do not feel it is necessary to go into the details of this particularly brutal triple murder.

that's more intangible needs to be considered rather then you can't put two rules down and say okay these are the rules that determine it and that is it. Has to be something deeper or more intangible when it comes down to a question of deciding whether or not you would impose a death sentence or take someone's life from him.

"Q: And so at least part of your dissatisfaction is with the limitations placed upon the jury by those two special issues; is that right?

"A: Yes.

\* \* \* \* \* \*

"Q: ... So, would you be unable to take an oath as a juror to render a true verdict based upon the law in the State of Texas as it has been represented to you in that situation where the State proved to you beyond a reasonable doubt that the question should be answered yes? Could you take an oath to follow the law which would require you to answer the questions yes if they are proven to you beyond a reasonable doubt?

"A: No, I don't believe I could.

"Q: Beg your pardon?

"A: I don't believe I could, no.

"Q: You don't believe you could take that oath?

"A: No.

\* \* \* \* \* \*

"A: I can look at either issue separately.

"Q: Okay, that is what the law requires you.

"A: I can in fact look at both and feel whatever the particulars of the case might be I can say I find yes to both of these; but knowing by doing that the death penalty will be imposed, then if my conscious or if my feelings about the case were that it was not warranted, then I would not be able to. I wouldn't be able to do it. Wouldn't be able to say—

"Q: Would your conscience or feelings about the case lead you to believe that the State had not proven one of these two questions?

"A: No, I just don't feel the criteria aren't—I just—I might say yes both of these criteria have been met in my mind but I still feel like looking at whatever any one particular case I might say, my conscience will not allow me or I don't feel that the death penalty is proper. So how do I get around that? Well, then I would have to vote no to one of those or have to say no to issue two or more.

\* \* \* \* \* \*

"A: They might prove to me both of them—that I might say yes to both of them, but still the particulars of the case in my own mind might be such that I didn't feel the death penalty was warranted.

"Q: Even though the State—

"A: Proved both of them, I still would vote no to whatever on one of them or say no to one of them.

"Q: Okay, Mr. Shelby, thank you for your time. I appreciate your candor and honesty.

"THE COURT: Thank you. Challenge is granted. Mr. Shelby I am going to excuse you as a juror."

In light of the foregoing exchanges, we hold that veniremember Shelby was excludable under *Adams v. Texas*, supra, and *Wainwright v. Witt*, supra. His inability to deal with his feelings about the death penalty within the bounds of the law manifested themselves with clarity. Mr. Shelby did not equivocate in his answers as he explained that his personal beliefs would so affect his judgment that he would be unable to follow the law or take the oath required of jurors in a capital case. There was no error in excusing him from service as a juror in this cause. Appellant's first point of error is overruled.

■ Appellant raises similar contentions in his third point of error regarding veniremember Wilhelmina Johnson. Point of error number three states:

"The trial court erred in excusing veniremember Wilhelmina Johnson for cause because the record does not show that she was unfit to serve on a capital

murder jury and this error denied appellant his right to an impartial jury under the United States and Texas Constitution."

While the point of error is directed solely at the veniremember's exclusion for cause, the record reveals that the only objection made at trial went to the limitation of defense counsel's questioning of the veniremember:

"Q: As I understand it, what you're telling me is if you find somebody guilty of capital murder and you go to the punishment stage, just because you found they intentionally acted or you found they're guilty of capital murder, you wouldn't automatically answer question number one "yes" in every case, would you?

"A: Yes.

"Q: You understand there's a difference between—

"A: Yes, I understand.

"THE COURT: I'm going to cut you off. I'm going to sustain the motion.

"DEFENSE: *We object to the court not giving us a chance to rehabilitate the juror.*

"THE COURT: Okay. Mrs. Johnson, we're going to excuse you as a juror." (Emphasis added).

A proper and timely objection must be made to preserve alleged error for appellate review. This Court has long held that failure to object to an improper ruling during voir dire can waive the error. *Bridge v. State,* 726 S.W.2d 558 (Tex.Cr.App.1986); *Jordan v. State,* 707 S.W.2d 641 (Tex.Cr.App.1986); *Phillips v. State,* 701 S.W.2d 875 (Tex.Cr.App.1985); *Barney v. State,* 698 S.W.2d 114 (Tex.Cr.App.1985). Moreover, the trial objection must comport with the point of error on appeal. *Richardson v. State,* 744 S.W.2d 65 (Tex.Cr.App.1987); *Hernandez v. State,* 643 S.W.2d 397 (Tex.Cr.App.1982); *Esquivel v. State,* 595 S.W.2d 516 (Tex.Cr.App.1980). Finding that the objection that was made fails to comport with the point of error on appeal and that there was a total failure to object to the exclusion of the juror, we overrule appellant's third point of error.

Appellant's second point of error states:

"The trial court erred in refusing appellant's trial counsel's request to question venireperson Cedric Anthony Nix in violation of *Perillo v. State,* 656 S.W.2d 78 (Tex.Cr.App.1983). This error denied appellant his right to an impartial jury under the United States and Texas Constitution."

In *Perillo,* we explained that a trial judge commits error in refusing defense counsel permission to question a veniremember in a death penalty case. However, such an error may be shown to be harmless.

"Whether such error may rise to the level of reversible error depends upon the answer to the following question: Whether, at the time the State makes its challenge for cause, or at the time the trial judge grants or sustains the State's challenge for cause, the prospective juror has been shown to be absolutely disqualified under *Adams v. Texas,* supra, and *Witherspoon v. Illinois,* supra, i.e., *has the juror, through questioning by the prosecuting attorney or the trial court, made it absolutely and unmistakably clear that he would automatically vote against the imposition of the death penalty?"* (Emphasis added). *Perillo,* 656 S.W.2d at 80–81.

While the general rule in *Perillo,* supra, is sound, the language highlighted above fails to reflect the evolution of the standard of measure for the constitutionally permissible exclusion of veniremembers. The language used by the *Perillo* Court manifests the *Witherspoon* standard. While *Witherspoon* was the rule at the time of the *Perillo* decision, the rule was modified by the Supreme Court in *Wainwright v. Witt,* supra, in which it was decided that the proper standard for determining when a veniremember may be excluded for cause because of his or her views on capital punishment is whether those views would prevent or substantially impair the performance of his or her duties as a juror in accordance with the instructions and the oath. Consequently, appel-

late review of claims of erroneous denial or limitation of questioning should focus on whether the veniremember's views on capital punishment would prevent or substantially impair his performance as a juror. With this principle in mind, a brief review of some of veniremember Nix's voir dire is appropriate. As the portions of the examination excerted below indicate, Mr. Nix had problems following the law in regards to the State's burden of proof and the defendant's right to refuse to testify in his own behalf.

"Q: ... Can you follow the law there and not require the defense to put on any evidence whatsoever?

"A: I don't know. I somewhat doubt it. I feel like if before, for instance, if you are going to execute somebody you should hear both sides, and I feel the law is not very well versed a lot in that.

"Q: Like I said before, you are entitled to you personal feelings.

"A: Granted. But what I am saying I don't feel like a person should be disposed of, zapped, executed, however you wish to phrase it, without him giving his point of view, or his story, so to speak.

"Q: Well let's talk about the two parts of the trial and see how you might react under these circumstances. Okay? First part is the guilt-innocence part. State has to prove beyond a reasonable doubt that somebody is guilty.

"A: How can they prove it if they haven't heard both sides?

"Q: Well, the law says—

"A: I just said perhaps maybe it needs to be looked at in a little deeper.

"Q: Law says that the state always has the burden of proof, never shifts to the defense. Defense doesn't have to prove the defendant is innocent. If your personal requirement is such you would have to hear from the defendant before you could find somebody guilty, then that is strictly your business. All I can hope to do is tell you what the law is. If your personal opinion is such you could not follow the law in that area, that is fine. Nobody is try-ing to persuade you otherwise. So I already explained to you what the ground rules are here basically. I think you understand that. So let me ask you this: Is your personal belief about the requirement of the defendant testifying so strong that you could just never find somebody guilty of capital murder unless you heard from the defendant himself?

"A: I would say so, yes.

   *     *     *     *     *     *

"Q: ... There are some people, quite frankly, would say: Look I can never answer these two questions yes causing somebody to get the death penalty unless I hear from the defendant.

"A: That's right.

"Q: I am not going to send a silent man to death whom I have never heard from?

"A: That is it, yes.

"Q: You understand I cannot call the defendant to the stand. The state can not call the defendant to testify. I have no control over that. Is that clear?

"A: That is very clear with me, but I would like to ask you why not?

"Q: Hum. I don't think they taught me that in law school. I think I can answer the question. Basically it goes like this: Person who is accused of a crime does not have to prove his innocence.

"A: Why? It is his life on the line.

"Q: You are talking common sense now. Sometimes common sense conflicts with what the law is. The law is the government always has the burden of proof, in our state anyway. Person doesn't have to prove his innocence. People who are accusing him have to prove he is guilty. So he doesn't have to, in effect, as a matter of law lift a finger in his defense. And on this specific subject, this is kind of an off-shoot of it. He doesn't have to testify at the penalty phase of the trial of a capital murder trial. I need to find out if the defendant does not testify at the penalty phase of a capital murder trial

would you always answer one of these questions no, no matter what the proof was here, simply because you could not, in effect, sentence a person to death and—

"A: Morally I cannot.

"Q: You cannot why? Sentence a person to death?

"A: I cannot sentence a person to death without hearing his side of the story.

\*       \*       \*       \*       \*       \*

"A: Okay. Excuse me. My reason for saying what I did is because I cannot—I have got to live with myself, and I cannot, regardless of what the law is, I have got the law that I have got to live within myself. And there is no way on God's green earth, like life, I didn't give it, I am not going to take away unless I am absolutely positive. And the only way I feel like I can be absolutely positive that somebody committed some sort of crime or whatever case should happen to be is I must hear both sides. That is fair as that.

"THE COURT: Let me interrupt.

\*       \*       \*       \*       \*       \*

"THE COURT: ... If you don't believe the defendant is guilty based upon the evidence brought to you by the State of Texas, you have to find him not guilty. Right?

"A: That is where I can't agree with you. What I am saying I feel it is a necessity to hear both sides, not just the State of Texas. But also the defendant's opinion. That is my personal conviction about it.

"Q: And therefore, if he doesn't testify you are going to assume he's guilty?

"A: I didn't say that.

"Q: What are you going to do? You got—because the law is if he doesn't testify you can't consider that as a circumstance of his guilt. You can't hold it against him in any way, shape or form. Okay? That is what the rule is. Can you set aside your personal convictions for this trial and follow that rule?

"A: The more I listen, the more I am beginning to perhaps think I cannot because I got these moral convictions within myself, and I am going to do, like I say, I got to sleep at night. I am not going to take anybody's life where I ain't absolutely positive that this person is guilty of whatever offense that he is alleged to have committed.

\*       \*       \*       \*       \*       \*

"Q: ... And my question to you was and is still: That if the defendant in a capital murder case whom you have found guilty beyond a reasonable doubt, all right? You found him guilty. Now he is facing life or death. And the way that is determined is by your answers to these two questions. If you do not hear from the defendant, if he does not testify at the penalty phase of a capital murder trial, can you by your answers to these questions cause him to receive the death penalty if the state proves it to you beyond a reasonable doubt as is legally required?

"MR. TAYLOR: Objection. Repititious.

"THE COURT: Overruled.

"A: If you prove he is guilty to me, the party is over.

"Q: Oh, we have to prove more than he is guilty. We have got to prove these two questions should be answered at the penalty phase. Is that clear to you?

"A: What you said to me if you show to me beyond a shadow of a doubt, or whatever words you use, that he is guilty, quite natural, yes, sir; but what I am saying chances are you are not going to capivate my moral feelings about things in total until it's been totally proven to me. If you can do that, minus the defendant, you just got erased.

"Q: Okay. So the defendant's participation doesn't matter to you, or does it matter?

"A: It does matter to me, but if you can totally prove to me without his testimony or whatever, fine; but I don't think

that it could overwhelmingly be proved without hearing his side of the case.

"Q: Okay. Let's change the subject slightly. The burden of proof is not going to be defined for you. You don't get a definition for it. We don't have one to work with, all right? You just look at it in a shorthand way as a measuring device, and each person has his own idea of what beyond a reasonable doubt is. You bear with me for a minute. You told me you have to be overwhelmed, have to be totally convinced. I need for you to express in your own terms for this lady who is writing it down how you feel about this burden of proof and what type of proof you would require before you could find somebody guilty beyond a reasonable doubt. Let's start with this, with some common terms. Does beyond a reasonable doubt mean the same thing to you as proof to a certainty?

"A: Yes.

"Q: Does it mean the same thing to you as absolutely, positively certain?

"A: Yes.

"Q: Does it mean the same thing to you as sure?

"A: That is all synonymous.

"Q: Would you agree with me that beyond a reasonable doubt is something less than beyond all doubt?

"A: Absolutely so.

"Q: Would you require a higher burden of proof than beyond a reasonable doubt before you could find someone guilty of capital murder?

"A: Is there a higher measure?

"Q: You and I agree here in our own terms that beyond all doubt is a higher burden than beyond a reasonable doubt, there is a higher measure?

"A: Correct.

"Q: So what burden of proof would you require before you could find someone guilty of capital murder? Would beyond a reasonable doubt be sufficient for you or would you require proof beyond all doubt?

"A: Proof beyond all.

"Q: Proof beyond?

"A: Proof beyond all, yes.

"Q: Beyond all doubt?

"A: Yes.

"Q: Same question as to the penalty issues one and two. Would proof beyond a reasonable doubt be satisfactory for you?

"A: No.

"Q: Before you could answer those questions yes?

"A: Yes.

"MR. TAYLOR: I object to it being repetitious.

"A: You are twisting me.

"Q: Would you require proof beyond all doubt before you could answer those questions yes or proof beyond a reasonable doubt, a lower burden we discussed? Would that be sufficient?

"A: All doubt in both instances.

"Q: Do you realize that the law does not require us to prove anything beyond all doubt?

"A: Well that is my moral conviction. That is how I feel about it. That the law is lacking. And maybe I am wrong, which I doubt.

"Q: Your personal requirement of the standard of proof is higher than what the law requires, is that true?

"A: Yes. My moral convictions tell me one way and the law says one thing, and I have got my own feelings about things.

"Q: So is it a fair statement, finally, Mr. Nix, that you can't follow the law in this area in such a way that proof beyond a reasonable doubt would not be sufficient for you as an individual?

"MR. TAYLOR: Objection. Leading and suggestive.

"THE COURT: Overruled.

"Q: You want me to ask you again?

"A: Would you, please?

"Q: Okay. My final question to you is: Is it your statement that proof beyond a reasonable doubt is not sufficient for you as a juror?

"A: That is correct.

"Q: Thank you very much for your time.

The voir dire examination of Mr. Nix stretches across numerous pages of the record. Mr. Nix had substantial problems with the burden of proof and clearly indicated that he would hold the State to a standard higher than beyond a reasonable doubt. The portions of the examination excerpted above also demonstrate the veniremember's inability to follow the law in regards to the defendant's right to refuse to put on any evidence in his defense. In light of these factors, and the fact that the examination of Mr. Nix was both thorough and competent, involving both counsel for the State and the Court, we hold there was error in excluding him from jury service without giving counsel for the defendant the option of questioning the veniremember. Though it was error to refuse defense counsel permission to question the veniremember, the error was harmless, as Mr. Nix's views on capital punishment were such that they would prevent or substantially impair his performance as a juror.

The appellant's final point of error is overruled and the judgment is affirmed.

MILLER, J., concurs in result.

CLINTON, Judge, dissenting.

The majority concludes that "[venireman] Nix's views on capital punishment were such that they would prevent or substantially impair his performance as a juror." If by this the majority means that exclusion of Nix was permissible under the standard announced in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), I am somewhat puzzled. Nix rather amorphously expressed a conflict between his "emotional feelings" and "a moral feeling" about the death penalty, but when queried how he would vote if capital punishment were put to the ballot, he indicated he "would probably vote for it." Thus, whatever substantial impairment Nix evinced, it does not appear to have derived from any profound opposition to the death penalty. It was not shown he could not answer Article 37.071 special issues honestly and in accordance with the evidence on account of any such opposition.

Thus, if we are to conclude he was excludable for cause, it must be because we find a basis in the record to support the trial court's conclusion that Nix harbored a bias against some other phase of the law upon which the State was entitled to rely. Article 35.16(b)(3), V.A.C.C.P.

Here, for reasons not well articulated in answers to the prosecutor and the trial court, Nix demonstrated an unwillingness to convict a capital accused without hearing from the accused himself, and seemed to hold the State to a burden of proof more stringent than beyond a reasonable doubt. Neither attitude stemmed from conscientious scruples against the death penalty so much as from a desire for certainty before imposing it. Nevertheless, as Judge Teague aptly instructed in his recent plurality opinion in *Hernandez v. State,* 757 S.W.2d 744, (Tex.Cr.App.1988), except in the particulars the analysis is much the same. Nix's responses do indeed provide a basis from which a rational trial court could conclude he had a bias against the law which he was incapable of setting aside. Under other circumstances we could say the trial court accordingly did not err in finding he was "substantially impaired." However, I cannot agree with the majority that the error in the trial court's failing to entertain appellant's attempt to rehabilitate the venireman was "harmless."

In the past, and especially since the decision of the Supreme Court in *Wainwright v. Witt,* supra, this Court has paid lip service to the trial court's discretion in ruling upon State's challenges for cause. A typical statement appears in *Ex parte Russell,* 720 S.W.2d 477, at 485 (Tex.Cr.App.1986):

"In making the determination of the qualification of a juror, great deference is to be given to the decision of the trial judge, who has broad discretion in his rulings in challenges, who was present, heard the tenor of the voice of the prospective juror, his demeanor, etc."

See also, e.g., *Smith v. State,* 676 S.W.2d 379, at 387 (Tex.Cr.App.1984); *Smith v. State,* 683 S.W.2d 393, at 401, n. 5 (Tex.Cr.App.1984); *Vanderbilt v. State,* 629 S.W.2d 709 (Tex.Cr.App.1981). Having

granted this discretion to trial courts, however, it seems to me we turn around and effectively revoke it when we continually conclude our discussions on these points of error with holdings that "we find" the venireman *to have been substantially impaired*, or that "clearly" he was so. At least in the context of what has been termed "equivocating" or "vacillating" veniremen, see *Williams v. State*, 622 S.W.2d 116, 121 (Tex.Cr.App.1981) (Teague, J., dissenting), it seems to me that due deference to the trial court means that he has discretion to find such a venireman is *not* in fact impaired, in spite of some obvious difficulty he may have. Categorically to hold, or at least to imply as our holdings do, that such a venireman is in every case substantially impaired sends a message to trial courts that in fact they do *not* have the discretion to overrule State's challenges for cause in the premises. Rather, as a matter of appellate review, this Court should simply hold there is a reasonable basis in the record to support a finding by the trial court that the venireman will be impaired in his ability to abide by his oath as a juror. *Hernandez v. State, supra.* Such a standard of appellate review does not preclude the trial court from exercising its discretion to find that, what from a cold appellate record may appear to be a truly equivocating or vacillating venireman, has actually proven himself, by demeanor, tone or howsoever, able in fact to follow the law. See *Perillo v. State*, 758 S.W.2d 567, at 577 (Tex.Cr.App.1988).

Having vested the trial court with this discretion to arbitrate challengeability of veniremen who appear, at least on a cold record, "to be genuinely noncommittal, vacillating, equivocal, or uncertain," *Hernandez v. State*, supra, at 753, we should never allow it to exercise that discretion unilaterally; that is, without affording the opponent of the challenge the opportunity to rehabilitate the venireman. It is true that as questioning ended in this cause a clear basis existed for the trial court to find Nix unable to put aside his own apparent bias against the law. We cannot say, as the Court effectively does today, that questioning by appellant's counsel in the instant case may not have laid a groundwork for the trial court to find Nix could in fact follow the law. We cannot say, for instance, that appellant's counsel could not have convinced Nix that his own peculiar standard for degree of certainty was actually no more stringent than the "reasonable doubt" standard mandated by law. By refusing to allow counsel this opportunity, the trial court effectively insulated itself from having to exercise that discretion we are so quick to afford. Moreover, for this Court now to reason that such error is "harmless," by concluding in our categorical way that "Mr. Nix's views on capital punishment were such that they would prevent or substantially impair his performance as a juror[,]" is actually to condone the trial court's abdication of its proper function in a capital voir dire. See *McGee v. State*, 774 S.W.2d 229, (Tex.Cr. App.1989) (Clinton, J., dissenting).

In this I cannot join, and therefore I respectfully dissent.

TEAGUE, Judge, dissenting.

I respectfully file this dissenting opinion.

The majority opinion by Presiding Judge McCormick overrules appellant's third point of error, namely: "The trial court erred in excusing venire member Wilhelmia Johnson for cause because the record does not show that she was unfit to serve on a capital murder jury and this error denied appellant his right to an impartial jury under the United States and Texas Constitutions", because it concludes that appellant's objection at trial, namely: "We object to the court not giving us a chance to rehabilitate the juror", fails to comport with his point of error. It further overrules the point of error because it finds appellant failed to object to the exclusion of prospective juror Johnson. Given the totality of the record, I find that the majority opinion is just dead wrong by both of its holdings. Furthermore, Rule 74, *Rules of Appellate Procedure*, which governs the preparation of a brief in a death penalty case, see also Rule 210, *Rules of Appellate Procedure*, does not mandate such a technical view of

appellant's complaint as the majority opinion requires. Lastly, if the majority of this Court does not believe that appellant's court appointed attorney has substantially complied with the rules, it should order that this part of appellant's brief be re-briefed, or grant appellant an out of time appeal.

The record clearly reflects that notwithstanding that she saw the merits of assessing someone life in prison, rather than death, prospective juror Johnson was a very strong "pro death penalty" juror. I find that the train got off the track when the prosecutor asked her a multifariously worded question about how she might answer the special issues: "Q: Are you saying because of the way you feel you could not answer those questions 'yes' based upon evidence beyond a reasonable doubt, *that you would need a greater amount of proof than that?* (My emphasis.) A: Right." The prosecutor also asked her: "... you would need proof beyond any doubt in your mind before you could answer those special issues 'yes'?", and she answered: "Uh-huh." The record, however, reflects that Johnson later responded to the following statements by the trial judge in the following manner: "All right, and the burden of proof is just beyond a reasonable doubt. A: Right. It's not beyond any doubt because they can't prove that a future act will occur beyond any doubt. A: Right. The Court: Right? Johnson: Uh-huh. They can prove it beyond a reasonable doubt. A: Right." Johnson also stated that merely because she had found someone guilty of capital murder she would not "necessarily" answer special issue number one, the deliberateness issue, in the affirmative. However, she did state affirmatively that she thought it was impossible to answer in the affirmative special issue number two, the future dangerousness issue. Nevertheless, she later agreed with the trial judge that the State could prove the answers to the special issues "beyond a reasonable doubt", and, after being given by the trial judge the "The sun's risen every day for the last 5,000 years" example of "proof beyond a

reasonable doubt," Johnson told the trial judge that she would hold the State to the standard "beyond a reasonable doubt." When, after the trial judge went over in depth with Johnson the case law distinction between the words "intentional" and "deliberate", with Johnson at all times agreeing with the trial judge that the law provided for a difference, Johnson stubbed her nervous toe, by agreeing with the trial judge's statement, "You understand it and you're still—you're going to automatically find that his conduct was deliberate. A: Yes." The prosecutor then stated: "We should suggest there's cause." Counsel for appellant was then permitted to examine Johnson. By asking clearly worded questions, contrary to many confusingly worded questions that had been previously asked by the prosecutor, Johnson answered the latter's questions with clearly stated answers. Appellant's counsel clearly established that Johnson was not disqualified from serving as a juror because she could not comprehend the legal distinction between "deliberately" and "intentionally". However, there is no question that appellant's counsel wanted to make the record absolutely certain that Johnson was not disqualified for that reason. The trial judge, however, out of the blue and without warning, then stated: "I'm going to cut you [defense counsel] off. I'm going to sustain the motion [sic]." Trial counsel for appellant then stated: "We object to the court not giving us the chance to rehabilitate the juror." The trial judge then stated, in response: "Okay, Mrs. Johnson, we're going to excuse you as a juror."

Given what happened in the trial court, it should be obvious to almost anyone that the majority opinion clearly misperceives what the record reflects and what appellant contends by way of his point of error, and his argument thereunder. Especially is this true when one carefully reviews the questions that defense counsel asked Johnson and the answers Johnson gave, in conjunction with what the trial judge did "out of the blue." From a totality of Johnson's voir dire examination, when the trial judge "out of the blue" sustained the State's challenge for cause, Johnson was not then

subject to the prosecutor's challenge for cause, namely: "We should suggest there's cause." (Perhaps the prosecutor's real "cause" was the following: "For reasons I don't want to give, I don't want prospective juror Johnson serving on this jury, and I don't want to use a peremptory strike on her either.")

The State, in its appellate brief, asserts: "The situation presented in the instant case appears to be a mirror image of that discussed in *Sawyers v. State*, 724 S.W.2d 24, 28 (Tex.Crim.App.1986) ..." (Page 18 of State's Brief.) I find that it is possible to make such a statement only if one looks at the record through fogged up glasses.

In *Sawyers*, supra, the issue that the defendant presented was that the trial judge erred in terminating the defense attorney's questioning of a prospective juror. However, the objection at trial was the following: "Your Honor, for the purpose of the record, we object to him [the prospective juror] being excused for cause." In rejecting the defendant's complaint, this Court pointed out the following: *"No objection was voiced as to the limitation nor was request made for additional time of the voir dire examination."* (28). (My emphasis.) The record here, however, clearly reflects that counsel was objecting to the trial judge's action in limiting counsel's voir dire examination, because he had not completed his "rehabilitation" voir dire examination. Here, while in the process of removing any doubt about prospective juror Johnson's being able to serve as a juror in this cause, on the issue of understanding the legal distinction between the words "intentional" and "deliberate", the trial judge, out of the blue, terminated the voir dire and sustained the State's previously uttered "We should suggest there's cause." At that moment in time, under this Court's totality of the voir dire examination rule, Johnson was clearly not subject to being challenged for cause because she did not understand and could not appreciate the legal distinction between the words "intentional" and "deliberate", and appellant's attorney timely and properly objected to

the trial judge cutting him off when he was nearing the point where not even a majority of this Court could say beyond a reasonable doubt that prospective juror Johnson had not been thoroughly rehabilitated on this point. Appellant's point of error on appeal clearly comports with the complaint he made in the trial court.

Given the record of this cause, to wire around this appellant in this death penalty case, for the reasons that the majority opinion gives, should shock almost anyone's conscience. It certainly does mine.

I therefore respectfully dissent to the reasons the majority opinion gives to overrule appellant's third point of error. This, however, does not mean that I agree with everything else the majority opinion states—because I don't. I do agree, however, with what Judge Clinton has stated in the dissenting opinion that he has filed in this cause.