COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-341-CR

 

 

LAWRENCE SAMUEL JR.                                                      APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I.  Introduction








Appellant
Lawrence Samuel Jr. appeals his conviction for forgery.  See Tex. Penal Code Ann. ' 32.21
(Vernon Supp. 2009).  In six points,
Samuel argues that the evidence is legally and factually insufficient to
sustain his conviction and that the trial court erred by denying his motion to
suppress his statement made to police. 
We will affirm.

II.  Background

In
January 2007, Panthea Christakis went to Jackson‑Hewitt, located in a Wal‑Mart
in Arlington, Texas, to have her income taxes prepared.  Christakis=s tax
refund totaled almost $3000.  The Jackson‑Hewitt
representative who prepared Christakis=s tax
return told her that her check would be available in about eight business
days.  The representative also told
Christakis that she would need to return in order to pick up her check.  According to Christakis, over two weeks
passed and no one from Jackson‑Hewitt contacted her.  Christakis repeatedly called to inquire about
her check.  At first, Jackson-Hewitt=s
representatives explained that Christakis=s check
had not arrived, but later they informed her that her check had been delayed
because of a misspelling and that she would need to come back and amend her
paperwork in order to receive her check. 
But before Christakis could return, she received a letter from a bank
explaining that she had cashed the check and that she owed bank fees.








Confused,
Christakis called Jackson‑Hewitt multiple times and explained to numerous
representatives that she had never received her check.  Eventually, on March 16, 2007, Jackson‑Hewitt=s
general manager, Donald Maceachran, called Christakis and told her that he
would print her a new check within twenty‑four hours.  Christakis, however, did not receive a check
until late March 2007.  Christakis
testified that she had never authorized anyone to cash the first check and that
she had never seen Samuel before the day she testified at trial.








Maceachran
testified that he first learned sometime in February 2007 that Christakis had
not received her check.  According to
Maceachran, his office manager called him concerned that a check had been
printed for Christakis but the check could not be located.  Maceachran said that he did not remember
whether he was ever aware that the first check might have had a misspelling on
it, but he was initially unable to locate the first check when it was brought
to his attention that Christakis had not received it.  Maceachran testified that the original check
would have been printed at the branch where Samuel worked and that all
employees at that branch would have had access to Christakis=s
check.  He also said that if Christakis
had picked up the check, there should have been a photocopy of her
identification and a sheet with her signature indicating that she had picked up
her check, but that neither of these items were found in her file.  Maceachran said that after he learned the
check was missing, he called an employee meeting which Samuel attended.  Maceachran stated that he had each employeeCincluding
SamuelCwrite
down what they knew about the missing check. 
By Maceachran=s account, Samuel responded that
he Ahad
never seen the check and had nothing to do with the disappearance of the check.@  Maceachran then called Jackson-Hewitt=s bank
in an effort to get a reprint of the check and learned that the first check had
in fact been cashed.[2]  Maceachran investigated.

The bank
faxed Maceachran a copy of the negotiated check, and he learned that the check
had been cashed at a convenience store in Fort Worth.  Maceachran went to the store and learned that
whoever cashed the check had presented Samuel=s
identification along with the check. 
Maceachran also learned that the negotiated check also contained Samuel=s
thumbprint on it.  Maceachran said that
he fired Samuel shortly after learning these things.  According to Maceachran, his files indicated
that he fired Samuel on February 27, 2007. 
Maceachran identified Samuel at trial as the man he fired.  Maceachran also contacted the Arlington
Police Department.








Abdul
Wafayee, the owner of the convenience store where the first check was negotiated,
testified at trial.  Wafayee said that
his store was a combination gas station, grocery store, and check cashing
store.  According to Wafayee, whenever a
check is cashed for more than $500, he makes a photocopy of the check, a
photocopy of the driver license of the person who is cashing the check, and the
right thumbprint of the person cashing the check.

Wafayee
said that he was familiar with Samuel because Samuel was a routine
customer.  He said that on the night the
check was cashed,[3]
Samuel came to the store and presented the check, his driver license, and his
business card.  Wafayee also testified
that Samuel came in with a file and explained that he was cashing the check for
one of his clients.  Originally, Wafayee
testified that it was Samuel who signed the back of the check with the
signature AP. Christakis,@ but
later Wafayee said that he did not remember whether the check was signed in his
presence or prior to the check being presented to him.  When asked again by the State whether Samuel
signed the check, Wafayee said that he was Apositive@ that
Samuel signed the check in his presence. 
But when defense counsel asked again who signed the check, Wafayee said
both that his testimony was that Samuel had signed the check and also that he
did not remember who signed the check. 
Wafayee admitted that English is not his Afirst
language.@








Wafayee
said that he cashed the check because Samuel Aworks
for the tax office, I trusted him.  He
had [a] business card.@ 
According to Wafayee, he could not remember whether Samuel had come in
by himself or with a woman and that if Samuel had come in with a woman, he did
not remember what she looked like. 
Wafayee also said that he did not remember telling the police that
Samuel had come in alone to cash the check.

The
State then called Arlington Police Detective Darren McMichael to the stand.  The court held a motion to suppress hearing
outside the presence of the jury.  Samuel
argued that the statement he made to McMichael during McMichael=s
investigation should be suppressed because Samuel believed he was in custody
after McMichael read a card to Samuel that contained Miranda
warnings.  Specifically, Samuel argued
that reading Miranda warnings to an individual who is not in custody is Ainappropriate@ because
it would lead someone to Abelieve that, in fact, they were
in custody.@ 
Samuel also contended at the hearing that he was not challenging the
voluntariness of his statements nor was he alleging that McMichael Adid
anything uncordial or coercive in obtaining [Samuel=s]
statement.@








At the
hearing, McMichael testified that during his investigationCin early
April 2007Che called Samuel and asked him Ato
voluntar[ily] come in and give a statement regarding the incident.@  McMichael said that Samuel came to the
station on his own and that no one went and picked him up and brought him to
the station.  After Samuel arrived, McMichael
informed Samuel that he was not under arrest, that Ahe was
there voluntarily[,] and [that] he could leave at any time.@  McMichael said that it was the Arlington
Police Department=s policy to read a Acity-issued
green Miranda card@ to anyone who was being
interviewed.  The State introduced into
evidence a card bearing Miranda warnings that has a line drawn
diagonally across the text and a signature. 
McMichael said that policy dictated that he read the card and have any
interviewee sign a diagonal line drawn on the card after the warnings are read
to indicate the interviewee waived those rights.  According to McMichael, the signature on the
green card was Samuel=s and the signature indicated
that proper policy had been followed. 
McMichael testified that he made it clear to Samuel that he was free to
leave.  He also testified that Samuel was
not restrained in any way, there was no warrant for Samuel=s
arrest, Samuel was the closest to the door in the interview room, and there
were no other officers in the room with them.








McMichael
recalled that after he confronted Samuel with evidence that Christakis=s check
had been cashed by someone using Samuel=s identification,
Samuel explained that Aa woman had come and approached
him about having difficulties cashing the check because there was a misspelling
of her name.@ 
After he was approached, Samuel explained that he took the check to a
convenience store along with the woman and helped her cash the check.  McMichael asked Samuel to describe the
woman.  After Samuel gave a description
of the alleged woman, McMichael challenged Samuel by explaining that he Ahad
factual evidence [that McMichael] knew the actual correct answers to and
advised him that . . . the answers he was giving me were not the
fact.@  McMichael said that Samuel immediately asked
if there was something he could do Ato make
this go away.@ 
According to McMichael, Samuel even offered to pay the money that was Ataken
from the check [if] this [would] go away.@  McMichael responded that the victim was
adamant about prosecuting.  At this time,
by McMichael=s account, Samuel stated that he
Adidn=t want
to talk much more about the case.@

McMichael
said that he then informed Samuel that he would make note in his report of his
decision to conclude the interview.  When
asked what happened next, McMichael said:

Well, as I=m
wrapping up my notes and everything that I had on the table, I told him that ‑‑
I said, [Samuel], I said, there are reasons that people make decisions that
they do, and I said, sometimes people opt for bad decisions.  And, at that point, he put his hands in his
head and said, you hit the nail on the head. 
And so we got up and started to proceed out of the interview room and
down the hallway to exit the police station.








McMichael
said that as they walked toward the exit, Samuel said that the pressures of
money had gotten to him, that he had cashed the check because he needed money
to pay bills, and that no one had accompanied him to the convenience store to
cash the check.  McMichael said that the
interview lasted A[a]pproximately 30 to 40 minutes@ and
that after Samuel made these statements to him, Samuel left the police
station.  McMichael also said that he did
not record the interview because of technical difficulties.  At the conclusion of the hearing, the trial
court overruled Samuel=s objection and said, AI=m going
to find that [Samuel] was not in custody when he made the statement.@

McMichael
then testified before the jury. 
McMichael retold many of the same things he had already said during the
hearing.  He also detailed his
investigation and how it led him to Samuel. 
McMichael said that he interviewed Wafayee and Wafayee had indicated
that Samuel was alone when he cashed the check and that Samuel was the person
who signed the check.  In addition,
McMichael said that during his investigation Christakis signed a forgery
affidavit which indicated that she was not the person who cashed the check and
that she had not benefitted from the check being cashed in any way.  McMichael also said that Christakis was
interested in having the person who cashed the check prosecuted.








Samuel
testified in his own defense.  According
to Samuel, a coworker had brought his attention to a check with a misspelling
of Christakis=s name on it in January
2007.  Samuel said the coworker laughed
about the misspelling made by another coworker who frequently made mistakes.  Samuel said that sometime in Amid
February@ a woman
came to his Jackson-Hewitt booth claiming to be Christakis.  Samuel said that it was late, Aabout
9:00.@  Samuel described the woman as crying because
her check had a misprint on it, and Samuel said she claimed that she was unable
to cash her check.  Samuel said that when
she showed him the check, he was already familiar with it because of the
coworker who had previously pointed it out to him.  Samuel testified that he told the woman that
he could help her cash her check by taking her to a convenience store and that
he felt compelled to do so because he knew of the misspelling and he knew that
people who come to Jackson-Hewitt are typically lower income individuals.








Samuel
stated that the woman presented an ID to him, but that he did not look at it
closely because of his familiarity with the check.  According to Samuel, the woman followed him
in a separate car to Wafayee=s
convenience store, where they both went in and presented the check to Wafayee,
and he showed Wafayee his ID.  Samuel
said that the woman who brought the check to him was standing next to him in
the convenience store while Wafayee processed the check.  Samuel said that after he cashed the check, AI gave
her the money.@ 
Samuel testified that after he gave her the money, she thanked him, they
went their separate ways, and he never saw her again.  Samuel also said that he was never fired from
Jackson-Hewitt; rather, he Agot
another job.@ 
Samuel said that Christakis, who had testified earlier, was not the
woman who came to him asking for help.

Samuel
also testified to his account of the interview with McMichael.  Samuel said that McMichael called him in late
March.  According to Samuel, he thought
that he was being interviewed about a scanner that was missing from
Jackson-Hewitt.  When McMichael asked him
about the check, Samuel said that he told him that he had helped a woman cash a
check that had a misspelled name on it. 
Samuel denied ever telling McMichael that he had cashed the check
alone.  Samuel also denied ever signing
the check.  Samuel claimed that the check
was already signed when it was received by him. 
Samuel said that McMichael claimed to have a videotape of him cashing
the check.








Samuel
admitted that he told McMichael that he was willing to pay back whatever money
Jackson-Hewitt might have lost because of his actions but that he had offered
to do so because he believed he had made a mistake helping a person, not
because he had committed a crime.  Samuel
said that although he was intimidated by McMichaelCbecause
McMichael is Aa pretty big guy@Che left
the police station after the interview. 
Samuel denied ever telling McMichael that he had cashed the check alone
because of money pressures.  After closing
arguments, the jury retired to deliberate. 
The jury found Samuel guilty and assessed punishment as six years=
confinement.  This appeal followed.

III.  Samuel=s Motion to Suppress

In his
third, fourth, fifth, and sixth points, Samuel contends that the trial court
erred by refusing to suppress his oral statement to McMichael.  Specifically, Samuel contends that his
statement was involuntary because it was the result of Aduress,
coercion and improper promises@; that
McMichael did not honor his request to end the interview; and that his rights
guaranteed under Article 38.22 of the Texas Code of Criminal Procedure were
violated when his statement was not recorded. 
Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon 2005).  The State counters that Samuel has failed to
preserve these claims for our review because they do not comport with his
objections made at trial.  See
Heidelberg v. State, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) (stating
that it is well settled that the legal basis of a complaint raised on appeal
cannot vary from that raised at trial). 
The State also counters that the trial court did not err by allowing
McMichael to testify about Samuel=s
statement.








We will
assume without deciding that Samuel has preserved these points for our
review.  We conclude that the question
that is asked in each of Samuel=s points
is:  Did the trial court err by
determining that Samuel was not in custody when McMichael interviewed him?  See Beckwith v. United States,
425 U.S. 341, 346, 96 S. Ct. 1612, 1616 (1976) (reasoning that the need to
scrupulously honor a defendant=s
invocation of Miranda rights does not arise until created by the
pressures of custodial interrogation); see also Davis v. Allsbrooks, 778
F.2d 168, 170 (4th Cir. 1985) (precustodial assertion of right to remain
silent, even after Miranda warnings given, does not require termination
of interrogation).  We answer this
question in the negative and hold that the trial court did not err in
overruling Samuel=s motion to suppress his
statement.








The
Fifth Amendment to the United States Constitution commands that no person Ashall be
compelled in any criminal case to be a witness against himself[.]@  U.S. Const. amend. V; see also U.S.
Const. amend. XIV.  The warnings set out
by the United States Supreme Court in Miranda v. Arizona were
established to safeguard an uncounseled individual=s
constitutional privilege against self‑incrimination during custodial
interrogation.  384 U.S. 436, 442, 86
S. Ct. 1602, 1611 (1966).  The
Supreme Court has defined Acustodial
interrogation@ as Aquestioning
initiated by law enforcement officers after a person has been taken into
custody or otherwise deprived of his freedom of action in any significant way.@  Miranda, 384 U.S. at 444, 86
S. Ct. at 1612.  Unwarned statements
obtained as a result of custodial interrogation may not be used as evidence by
the State in a criminal proceeding during its case‑in‑chief.  Id.; but see Harris v. New York,
401 U.S. 222, 225B26, 91 S. Ct. 643, 645B46
(1971) (holding that Miranda does not foreclose the use of an unwarned
statement to impeach a defendant=s
credibility if the statement was not coerced and was given voluntarily).








In
Texas, Article 38.22 of the Texas Code of Criminal Procedure governs the
admissibility of statements made by a defendant during custodial interrogation
in a criminal proceeding.  Section 3
provides that an oral statement is admissible against a defendant in a criminal
proceeding if, among other things:  (1) the statement was
electronically recorded; (2) the defendant was given the warnings set out
in Section 2(a) before the statement was made and it is included on the
recording; and (3) the defendant Aknowingly,
intelligently, and voluntarily@ waived
the rights set out in the warnings.  Tex.
Code Crim. Proc. art. 38.22 ' 3(a)(1)B(2).  The warnings provided in Section 2(a) are
virtually identical to the Miranda warnings, with one exceptionCthe
warning that an accused Ahas the right to terminate the
interview at any time@ as set out in Section 2(a)(5)
is not required by Miranda.  See
Perillo v. State, 758 S.W.2d 567, 575 (Tex. Crim. App. 1988) (stating Athat Miranda
warnings must precede a confession offered under Article 38.22, ' 3(c)@).  As with the Miranda warnings, the
warnings in Section 2(a) of Article 38.22 are required only when there
is custodial interrogation.  Tex. Code
Crim. Proc. art. 38.22 '' 3(a), 5; Herrera v.
State, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007).  Our construction of Acustody@ for
purposes of Article 38.22 is consistent with the meaning of Acustody@ for
purposes of Miranda.  Herrera,
241 S.W.3d at 526.








When
considering Acustody@ for Miranda
purposes, we apply a Areasonable person@
standard:  A[a] person is in >custody= only
if, under the circumstances, a reasonable person would believe that his freedom
of movement was restrained to the degree associated with a formal arrest.@  Dowthitt v. State, 931 S.W.2d 244, 254
(Tex. Crim. App. 1996) (citing Stansbury v. California, 511 U.S. 318,
322B25, 114
S. Ct. 1526, 1528B30 (1994)).  Our custody inquiry also includes an
examination of all of the objective circumstances surrounding the
questioning.  Dowthitt, 931 S.W.2d
at 255.  The mere fact that an
investigation takes place in a police station does not make it custodial.  Cedillos v. State, 250 S.W.3d 145, 152
(Tex. App.CEastland 2008, no pet.).  And being the focus of the investigation does
not equate to being in custody.  Meek
v. State, 790 S.W.2d 618, 621 (Tex. Crim. App. 1990) (citing Beckwith,
425 U.S. at 347, 96 S. Ct. at 1616).

A trial
judge=s
ultimate custody determination presents a mixed question of law and fact.  Herrera, 241 S.W.3d at 526 (citing Thompson
v. Keohane, 516 U.S. 99, 112B13, 116
S. Ct. 457, 465 (1995)).  Therefore,
we afford almost total deference to a trial judge=s
custody determination when the questions of historical fact turn on credibility
and demeanor.  Herrera, 241 S.W.3d
at 526B27.  Conversely, when the questions of historical
fact do not turn on credibility and demeanor, we will review a trial judge=s
custody determination de novo.  Id.  The defendant, not the State, carries the
initial burden of establishing that a statement was the product of custodial
interrogation.  Id.








In this
case, McMichael testified that Samuel came to the police station on his
own.  McMichael said that he informed
Samuel that he was not under arrest and that he was free to terminate the
interview and leave at any time.  Samuel
signed a card indicating that he received warnings consistent with Article
38.22Cincluding
that he had the right to terminate the interview at any time.  By McMichael=s
account, the interview lasted between thirty and forty minutes, and when the
interview concluded, Samuel left the police station.  Even Samuel testified that he left when the
interview concluded.  Samuel never
testified that he did not feel free to leave the interview.  Samuel only said that he was intimidated by
McMichael because Samuel perceived McMichael to be Aa pretty
big guy.@

Affording
almost total deference to the trial court=s
determination regarding McMichael=s
credibility and demeanor, we hold that Samuel was not in custody at the time he
made his statement to McMichael.  See
Cedillos, 250 S.W.3d at 152 (holding that trial court did not err finding
defendant was not in custody when defendant was informed he was not under
arrest, received Miranda warnings, was told he could terminate the
interview, and was allowed to leave after the twenty- to thirty-minute
interview).  The trial court therefore
did not err by denying Samuel=s motion
to suppress.  We overrule Samuel=s third,
fourth, fifth, and sixth points.

IV.  Sufficiency of the Evidence

In his
first and second points, Samuel contends that the evidence is legally and
factually insufficient to support his conviction for forgery.  We disagree.








In
reviewing the legal sufficiency of the evidence to support a conviction, we
view all of the evidence in the light most favorable to the prosecution in
order to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772,
778 (Tex. Crim. App. 2007).

When
reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party.  Steadman v. State, 280 S.W.3d 242, 246
(Tex. Crim. App. 2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006).  We then ask whether the
evidence supporting the conviction, although legally sufficient, is
nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Steadman, 280 S.W.3d at
246; Watson, 204 S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, although legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.








Unless
we conclude that it is necessary to correct manifest injustice, we must give
due deference to the factfinder=s
determinations, Aparticularly those
determinations concerning the weight and credibility of the evidence.@  Johnson v. State, 23 S.W.3d 1, 9 (Tex.
Crim. App. 2000); see Steadman, 280 S.W.3d at 246.  Evidence is always factually sufficient when
it preponderates in favor of the conviction. 
Steadman, 280 S.W.3d at 247; see Watson, 204 S.W.3d at
417.

To
support Samuel=s conviction for forgery, the
State was required to prove that Samuel, with the intent to defraud or harm
another, passed a writing that purported to be the act of another who did not
authorize the act.  See Tex. Penal
Code Ann. ' 32.21; Williams v.
State, 688 S.W.2d 486, 488 (Tex. Crim. App. 1985).  The intent to defraud or harm another may be
established by circumstantial evidence, and the burden is on the prosecution to
prove each and every element of the offense charged.  Williams, 688 S.W.2d at 488.  In the case of forgery, the culpable mental
state requires proof of knowledge that the instrument is forged.  Id.








Viewing
all of the evidence in the light most favorable to the prosecution, the record
reveals that Samuel admitted to McMichael that he had cashed the check alone
because he needed money to pay bills and that there was never a woman claiming
to be Christakis who accompanied him to the convenience store to cash the
check.  There is no evidence that anyone
but an employee ever accessed the check that was cashed.  Samuel had access to the check.  Christakis testified and signed affidavits
that she never received the first check. 
Samuel=s supervisor testified that
Samuel originally denied ever knowing anything about the check.  The jury could have reasonably concluded that
this statement to Maceachran and his changing statement to McMichael showed a
consciousness of guilt.  See Lee v.
State, 866 S.W.2d 298, 302 (Tex. App.CFort
Worth 1993, pet. ref=d) (holding that lying to a
neighbor about a foul smell, along with other factors, showed defendant=s guilt
and awareness of the crime); see also Couchman v. State, 3 S.W.3d 155,
163B64 (Tex.
App.CFort
Worth 1999, pet. ref=d) (holding that jury could
reasonably conclude that defendant lied because he had something to hide and
changing his story was evidence of his consciousness of guilt).  The record also shows that Samuel=s
identification and thumbprint were used to cash the check and no other person=s
identification or thumbprint were ever recorded.  Therefore, a rational trier of fact could
have found, beyond a reasonable doubt, that Samuel committed the essential
elements of forgery.  Jackson, 443
U.S. at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  We hold that the evidence is legally
sufficient to support Samuel=s
conviction and overrule his first point.








Furthermore,
we conclude that the evidence demonstrating Samuel=s guilt
is not so weak that the jury=s
determination is clearly wrong and manifestly unjust and that there does not
exist conflicting evidence that so greatly outweighs the evidence supporting
his conviction that the jury=s
determination is manifestly unjust.  The
evidence supporting the factual sufficiency of Samuel=s
conviction includes his admission to police that he cashed the check alone
because he needed the money.  Evidence
that he did cash the check includes:  Samuel had access to the check,
Samuel admitted familiarity with the check, and Samuel acknowledged cashing the
check using his own identification.








As
alleged contrary evidence, Samuel contends that there is ample evidence to
support his story to police and the jury that he was performing a customer service
and that he actually did accompany Christakis to the convenience store where
she went into the store with him as he cashed the check for her.  But Samuel himself testified that Christakis
was not the woman he claimed to have helped. 
Christakis testified that she had never seen Samuel before trial.  Furthermore, there was testimony from both
McMichael and Maceachran that Samuel had either lied about ever seeing the
check or had admitted that he lied about a woman accompanying him to the store
and that he cashed the check because he was desperate for money.  There was also additional testimony from
McMichael that Samuel asked to pay the money back in order to make the charges Ago away.@  The jury could have determined that Samuel
made up the story about a woman accompanying him to the convenience store and
that he did in fact cash the check because he needed the money.  Giving due deference to the jury=s
determinations, particularly those determinations concerning the weight and
credibility of the evidence, we hold that the evidence preponderates in favor
of Samuel=s conviction.  Steadman, 280 S.W.3d at 247; see
Watson, 204 S.W.3d at 417.  Thus, we
hold that the evidence is factually sufficient to support Samuel=s
conviction and overrule his second point.

                                        V. 
Conclusion

Having
overruled each of Samuel=s six points, we affirm the
trial court=s judgment.

 

 

BILL MEIER

JUSTICE

 

PANEL:  WALKER, MCCOY, and
MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  February 25, 2010











[1]See Tex. R. App. P. 47.4.





[2]The record indicates that
Jackson-Hewitt customers do not receive their original checks issued by the
IRS; rather, customers grant Jackson-Hewitt the authority to deposit original
IRS checks into a Jackson-Hewitt bank account and then issue new checks in the
amount of the IRS return minus Jackson-Hewitt=s fees for preparing the
customers= tax returns.





[3]The negotiated check
bares a banking mark that the check was processed by the processing bank on
February 26, 2007.